H. H. Bodzy and Marjorie W. Bodzy, et al. [1] v. Commissioner. Bodzy v. Commissioner
Docket Nos. 80032, 80044, 80095, 80116.
United States Tax Court
T.C. Memo 1962-40; 1962 Tax Ct. Memo LEXIS 266; 21 T.C.M. (CCH) 219; T.C.M. (RIA) 62040; February 28, 1962
*266 R. B. Cannon, Esq., Fort Worth Nat'l Bank Bldg., Fort Worth, Tex., for the petitioners. Douglas W. Moore, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners as follows: Docket
Defi-
Petitioner
No.
Year
ciency
H. H. Bodzy and Mar-
jorie W. Bodzy
80032
1954
$20,740.14
Stanley W. Weiner and
Donnie Weiner
80044
1954
37,459.27
James H. Snowden and
Frances G. Snowden
80095
1954
81,078.65
Charles Weiner and Anita
Kane Weiner
80116
1954
12,958.47
The issues for determination are the correctness of the respondent's action: (1) in disallowing a deduction of $246,803.59 taken for 1954 by Texas Crude Company, a partnership, as representing a business indebtedness owing to the partnership by Thermal Control, Inc., which became worthless within that year and accordingly increasing the amounts of the distributive shares of partnership income for 1954 of Marjorie W. Bodzy, Stanley W. Weiner, and Charles Weiner, who were members of the partnership; (2) in disallowing a deduction of $243,345.25 taken by James H. Snowden *267 and Frances G. Snowden for 1954 as representing a business indebtedness owing to James H. Snowden by Thermal Control, Inc., which became worthless within that year; (3) in disallowing a deduction of $5,000 taken for 1954 by James H. Snowden and Frances G. Snowden as representing a long-term capital loss sustained on stock in Thermal Control, Inc., which became worthless during that year; (4) in failing to allow to Stanley W. Weiner and Donnie Weiner a deduction for 1954 of $25,035.62 as representing a net operating loss sustained in 1956 which they are entitled to carry back and deduct for 1954; and (5) in failing to allow to Charles Weiner and Anita Kane Weiner a deduction for 1954 of $45,904.96 as representing a net operating loss sustained in 1956 which they are entitled to carry back and deduct for 1954. All other issues presented by the pleadings have been disposed of either by stipulation or by concession of the parties. General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners H. H. Bodzy and Marjorie W. Bodzy are husband and wife and at some time prior to 1949 Marjorie had her disabilities of coverture removed. Stanley *268 W. Weiner and Donnie Weiner, Charles Weiner and Anita Kane Weiner, and James H. Snowden and Frances G. Snowden, respectively, are husband and wife. The respective husband and wife petitioners reside in Fort Worth, Texas, reported their incomes on the basis of a calendar year, and filed their joint Federal income tax returns for 1954 with the district director in Dallas, Texas. The income tax return filed by James H. Snowden and Frances G. Snowden for 1954 was prepared on the cash receipts basis. Ted Weiner, whose income tax liability is not involved herein and who sometimes hereinafter is referred to as Ted, engaged in the oil production business about 1929 and has continued to be engaged in that business. Some of such business has been conducted through partnerships and corporations. He also has engaged in other types of business including the operation of an oil refinery, operation of machine shops for the repair of oil field machinery and equipment, and after some undisclosed time when he became able, did some financing of other types of business. In 1942 Ted and petitioners Stanley and Charles Weiner, and Marjorie W. Bodzy formed a partnership under the name of Texas Crude Company, *269 sometimes hereinafter referred to as Texas Crude. Their interests in the partnership during 1954 were Ted one-third, Stanley one-third, Charles one-sixth, and Marjorie one-sixth. The record is silent as to the business activities, if any, which Stanley, Charles, and Marjorie had engaged in prior to 1942. Upon formation of the partnership Ted became the managing partner thereof and has continued in that capacity. During that time he did not engage in any investment and lending activities or the providing of credit to others on his own behalf, and although all investment and lending activities and the providing of credit to others by the partnership were carried out by him and in his name, he was acting for and in behalf of the partnership, and in his conduct thereof. For 1954 Texas Crude filed a partnership return of income prepared on the calendar year and cash receipts basis. After becoming managing partner of Texas Crude, Ted was approached on different occasions respecting the partnership participating in various business deals, enterprises, or ventures. His procedure was to investigate them. As to those which he considered might be profitable he caused the partnership to participate *270 therein by making a small equity investment in them of partnership funds and advancing to them partnership funds or partnership credit or both with the idea that the deal, enterprise, or venture would become able to finance itself, ultimately repay the funds advanced, and leave a worthwhile investment. On an average, Ted considered only about one in 20 of the deals, enterprises, or ventures he investigated might be profitable. During 1950 through 1954 the partnership was engaged primarily in the oil business and Ted devoted about two-thirds of his business time to looking after that business and devoted the remaining one-third to investigating and considering other deals, enterprises, and ventures and looking after those in which he had caused the partnership to participate. In 1946 Ted, as managing partner of Texas Crude, participated with others in the organization of Mid-Tex Manufacturing Company, paid $10,700 of partnership funds for stock in the company, advanced something over $3,000 to an undisclosed party to enable him to acquire stock in the company, and informed the bank of which Mid-Tex was a customer that Texas Crude would "go on any of their [Mid-Tex] paper." The record *271 does not disclose that Texas Crude at any time did "go on" any of Mid-Tex's paper or otherwise advance that corporation any credit or make any loans to it other than as previously stated. The operations of Mid-Tex were profitable. The corporation became in need of a larger building and decided to move its operations to another location. On some undisclosed date subsequent to 1946 a corporation named Mid-Tex Development Company was organized by Ted and others. The Development Company acquired a site on a railroad siding and erected thereon a new building for the use of Mid-Tex Manufacturing Company. Ted, as managing partner of Texas Crude, paid $2,260 of partnership funds for stock in the Development Company and loaned the company $4,000. About 1950 or 1953 Ted, as managing partner of Texas Crude, participated with B. L. McFarland in the organization of McFarland Drilling Company, paid an undisclosed amount for one-half of the stock of the corporation and used the credit of the partnership in an undisclosed amount to purchase rigs for the use of the corporation and otherwise finance the corporation's operations. The corporation was organized on the basis of an agreement between Ted *272 and B. L. McFarland that the latter would be employed by the corporation on a salary basis and in a supervisory capacity and that when all the indebtedness of the corporation had been fully paid he would be issued the remaining one-half of the stock of the corporation. The operations of the corporation proved to be profitable. At an undisclosed time James H. McGraw desired to participate in a small way with Texas Crude in the oil business but did not have the cash available to do so. Ted, as managing partner of the partnership, entered into an arrangement with McGraw under which Ted "signed" McGraw's notes given to a bank for loans and thereby enabled him to participate in several ventures entered into by the partnership. McGraw repaid the bank loans. The ventures were profitable for both McGraw and the partnership. At an undisclosed time Ted, as managing partner of Texas Crude, paid $2,142 of the partnership's funds for an interest in a business conducted by a friend under the name of Fairway Steak House and thereafter advanced $1,100 to the business as a loan. Fairway's business was profitable and in 1951 Texas Crude received $4,066.67 in payment for its interest and for advances *273 to the business. The record does not disclose when James H. Snowden entered business or the character of the business he entered. However, in 1954 he was engaged primarily in the oil production business and he also was engaged in making diversified investments in deals, enterprises, and ventures. As with Ted Weiner, as managing partner of Texas Crude, Snowden was approached on different occasions respecting his participation in various business deals, enterprises, and ventures. Snowden's procedure respecting investigation of and participation in such items was similar to that of Ted's and the proportion of the items participated in to those investigated was about the same as with Ted, namely, one in 20. In participating in deals, enterprises, and ventures Snowden made the least equity investment possible with the actual development and operation being conducted with funds obtained on the personal credit of himself and those associated with him in the participation. About one-half of the bank borrowings made by Snowden for such purpose represented obligations for which Snowden and the other participants were jointly and severally liable and the remainder represented obligations *274 on which he and they were severally liable. On December 31, 1953, and December 31, 1954, Snowden was contingently liable in the amounts of approximately $932,650 and $625,500, respectively, as guarantor or endorser of obligations of various partnerships and corporations in which he owned interests and in the management of which he participated. Usually Snowden maintained a close contact with the management and operation of the enterprises in which he was a participant. Most of the enterprises in which Snowden participated were not intended to be and were not conducted in corporate form. During 1954 and for an undisclosed time prior thereto he devoted about one-fourth of his business time to investigating and participating in business enterprises which it was contemplated would be and were conducted in corporate form. Snowden promoted and was the principal organizer of Texcrete Company, a corporation organized in 1946 to manufacture and sell lightweight concrete masonry, which to that time had not been manufactured and sold in the southwest. The corporation was financed through sales by the corporation of its stock to Snowden and others and by loans obtained by the corporation. *275 To 1950, Snowden had been an endorser on loans to the corporation in the aggregate sum of approximately $250,000. The business of the corporation was successful and in 1950 the corporation was merged with Texas Industries. About 1948 Comanche Drilling Company, a corporation, was organized. The corporation purchased rigs from supply companies and engaged in drilling operations. Snowden and his "associates" endorsed an undisclosed amount of obligations incurred by the corporation in the purchase of the rigs. The record does not disclose that Snowden acquired any stock in the corporation or loaned any money to it. In 1953 or prior thereto Southwest Pattern and Foundry Company, a corporation, was organized for the purpose of making patterns and iron castings. At the solicitation of a personal friend, Snowden invested $3,000 in an undisclosed amount of stock in the corporation and loaned it $20,000. The business of the corporation was not successful and the building in which the corporation conducted its operations was sold for enough to pay an RFC loan made to the corporation. Snowden sustained a nominal loss as a result of his investment in and loan to the company. At some undisclosed *276 time Colon Fishing and Development Company, a corporation, was organized to fish the lagoons of the East Coast of Honduras. At the solicitation of a professional shrimp fisherman from Brownwood, Texas, Snowden invested an undisclosed amount in the stock of the corporation and either loaned the corporation or guaranteed its loans in the approximate amount of $20,000. The business of the corporation was not successful. During the period 1950 to 1954 Snowden participated in a number of oil ventures which were developed with borrowed money. The record does not disclose that any of these ventures were conducted in corporate form. Issue 1. Disallowance of Deduction Taken by Texas Crude Company as Representing Worthless Indebtedness of Thermal Control, Inc., and Increase of Amounts of Distributive Shares of Partnership Income of Partners of Texas Crude Company. Issue 2. Disallowance of Deduction Taken by James H. Snowden and Frances G. Snowden as Representing Worthless Indebtedness of Thermal Control, Inc. Issue 3. Disallowance of Deduction Taken by James H. Snowden and Frances G. Snowden as Representing Long-Term Capital Loss Sustained on Stock of Thermal Control, Inc., Which Became *277 Worthless. Findings of Fact In 1949 Paul Grinnell, a friend of Ted, was employed by a company engaged in the sale of air conditioning equipment. Grinnell represented to Ted that he was in a position to obtain the dealership for handling a certain type of air conditioning unit throughout the entire State of Texas and asked Ted if the latter would finance for him an interest in a new company to be formed to handle such air conditioning units. A conference between Grinnell, Ted, and Snowden followed at which they decided to form a corporation which would acquire the dealership. Thereafter on November 28, 1949, Thermal Control, Inc., sometimes hereinafter referred to as Thermal, was incorporated under the laws of Texas "to purchase and sell goods, wares and merchandise and agricultural and farm products" with its principal place of business in Fort Worth, Texas. In participating in the formation of Thermal as well as in participating in matters relating to it as set out below, Ted, as managing partner of Texas Crude, acted for and on behalf of it. The authorized capital stock of Thermal was $10,000 divided into 1,000 shares of a par value of $10 each. The incorporators and first directors *278 were Grinnell, Snowden and Ted Weiner, each of whom subscribed for 333 1/3 shares of the capital stock of the corporation. Grinnell subsequently released his right to the 333 1/3 shares of stock subscribed for by him and no stock in the corporation was ever issued to him. Thermal's capital stock of $10,000 was paid in by Ted Weiner and Snowden as follows: Paid by
Paid by
Date
Weiner
Snowden
1949
$2,500.00
$2,500.00
July 1950
833.33
833.33
June 1951
1,666.67
1,666.67
Total
$5,000.00
$5,000.00
At a meeting of the directors of Thermal on November 29, 1949, Grinnell was elected president and was employed as its general manager. On or about December 1, 1949, Thermal began business, acquired the above-mentioned air conditioning unit dealership and thereafter conducted business as distributor and wholesaler of air conditioning units, radios, television sets, and other products. Grinnell continued as general manager of Thermal until October 30, 1953, when his employment was terminated by Thermal. About that time E. Bayne Blankenship was elected executive vice president and was employed as its manager. He continued to serve in the foregoing capacities *279 until his resignation in late June or early July 1954. From the inception of Thermal on November 28, 1949, until its dissolution on March 24, 1958, Ted and Snowden were its only stockholders and as stockholders, officers, and directors thereof actively participated in the management of Thermal. During its taxable years ended November 30, 1950, through November 30, 1953, Thermal sustained losses from its operations as follows resulting in the indicated net deficits in its capital at the end of the respective years: Net capital
Fiscal year
deficit at
ended
Loss from
end of
Nov. 30
operations
year
1950
$12,323.24
$ 2,323.24
1951
3,863.45
6,186.69
1952
25,724.38
31,911.07
1953
52,216.61
84,127.68
Total
$94,127.68
During the months of December 1953 and January 1954, Thermal sustained an operating loss totaling $24,291.24 thereby further increasing its net capital deficit. At the close of business on January 31, 1954, Thermal had inventories of merchandise on hand from Ajax Products, Comfort Products, General Electric, Henderson Heaters, Sparton Television and other suppliers totaling $120,901.47. On that date, in addition to its liability *280 for overdrafts totaling $12,576.77 on its checking accounts with banks, Thermal owed accounts payable totaling $31,405.57 and notes payable to Continental National Bank and First National Bank, both of Fort Worth, Texas, totaling $197,190.79. Each year Ted and Snowden would review the business prospects of Thermal and in each of the years 1951 through 1953 the manager of the corporation would inform them that there was going to be "a big boom" in the sale of air conditioners that year and as a consequence they continued the corporation in business for another year to see if it could recoup its prior losses. During the latter part of December 1953 or early in January 1954, Blankenship, with the approval of Ted and Snowden, negotiated an arrangement whereby Thermal became distributor for a large territory in Texas of air conditioning machines (window units) produced by Remington Corporation, sometimes hereinafter referred to as Remington, Auburn, New York. Thereafter in January 1954 Blankenship told Ted and Snowden that he had an arrangement worked out with Remington whereby it would supply Thermal with all the air conditioners the latter might need and that he "thought one good *281 year would bail the company [Thermal] out, get it even." Also, early in 1954, an officer of Remington told Ted and Snowden that his company could supply Thermal with its air conditioner requirements for that year. Consequently Ted and Snowden decided to authorize Thermal to buy enough air conditioners in 1954 so that if it sold them it would recoup in that year all of the operating losses it had sustained in prior years. With a capital stock of only $10,000, Thermal was not adequately capitalized to conduct the business which it began in 1949 and had thereafter conducted and Ted and Snowden were aware of the fact. Following the beginning of business by the corporation in December 1949 Ted and Snowden in 1950 each advanced to the corporation $25,000 and subsequently during the time the corporation actively engaged in business they made additional cash advances to it. Firms supplying merchandise to Thermal were unwilling to supply it with merchandise on its credit alone and in order to induce such firms to sell merchandise to Thermal, Ted and Snowden guaranteed payment for all merchandise sold to the corporation. It also was necessary for Ted and Snowden to guarantee repayment of *282 the bank loans obtained by Thermal. On January 18, 1954, Ted and Snowden wrote Remington a letter which contained the following: In consideration of your shipping merchandise on standard terms in excess of that justified by the capital structure of Thermal Control, Incorporated, we the stockholders thereof, hereby individually and jointly guarantee full payment of any and all of your invoices presently outstanding or to be owing to you in the future, resulting from shipments to Thermal Control, Incorporated, and covered by purchase orders signed by E. B. Blankenship and Elmer L. Lockwood. At that time as well as previously Elmer L. Lockwood referred to in the above letter was a director and secretary and treasurer of Thermal. He also was administrative assistant to Snowden. On January 25, 1954, Thermal placed 9 purchase orders signed by both Blankenship and Lockwood with Remington for air conditioning units to be delivered over a period of time. Pursuant to such initial purchase orders Remington, during the period February 12, 1954, through April 14, 1954, shipped to Thermal merchandise in the total amount of $245,273.55. In authorizing such orders Ted and Snowden knew that *283 Thermal was ordering a greater quantity of merchandise than it had handled before and that the volume of operations of Thermal was being increased in an attempt to recoup its losses for all prior years. Following the placing by Thermal with Remington on January 25, 1954, of the above-mentioned purchase orders it thereafter in 1954 placed purchase orders with other of its suppliers. It also placed with Remington further purchase orders for air conditioning units which had been signed by both Blankenship and Lockwood. With respect to the latter, Thermal, beginning February 16, 1954, and continuing through May 6, 1954, placed 11 orders with Remington pursuant to which Remington during the period February 22, 1954, through May 14, 1954, shipped to Thermal merchandise in the total amount of $155,789.19. Four of such purchase orders bearing dates during the period March 16, 1954, through April 13, 1954, and for merchandise in the total amount of $11,101, after having been signed by Blankenship and Lockwood and before having been forwarded to Remington were raised by Blankenship, without authorization therefor, to orders for merchandise in the total amount of $118,350, or an increase of *284 $107,249. Shipments of merchandise pursuant to such orders as raised were made by Remington to Thermal during the period April 23, 1954, through April 29, 1954. Each of the 9 purchase orders placed by Thermal with Remington on January 25, 1954, each of the 4 purchase orders raised by Blankenship and then filed by Thermal with Remington, and a purchase order dated May 6, 1954, contain on their face the following statement as to the terms on which the merchandise ordered was being purchased: TERMS: 10% cash upon receipt of invoice. 90% Trade acceptance, First National Bank of Ft. Worth. Remington's acknowledgment of the foregoing purchase orders all contain thereon the wording "TRADE ACCEPTANCE." The record does not show that 6 other purchase orders placed by Thermal with Remington during the period February 16, 1954, through April 29, 1954, and the acknowledgments thereof by Remington did not contain statements as to terms like or similar to the foregoing. With respect to merchandise theretofore shipped to it by Remington, Thermal, by Blankenship as executive vice president, executed to Remington various trade acceptances bearing dates during the period February 12, 1954, through *285 April 14, 1954, totaling $247,041.36 and due June 15, 1954. Likewise with respect to other merchandise previously shipped to it by Remington, Thermal by Blankenship as executive vice president, executed to Remington various other trade acceptances bearing dates during the period April 22, 1954, through May 14, 1954, totaling $113,583.02 and due July 15, 1954. An accounting firm of Fort Worth, Texas, was employed by Thermal to examine the books and records of Thermal and to prepare monthly operating statements and comparative balance sheets with detailed supporting schedules of Thermal during the period December 1, 1953, through October 31, 1954. Ted and Snowden each were furnished a copy thereof for the respective months during the foregoing period. Delivery of such copies to Ted and Snowden was made from 2 to 3 weeks after the close of the months for which the respective statements were prepared. The statements for the months of February through August 1954 reflect the following at the end of each of the months with respect to Remington products handled by Thermal: Cost of
goods
Beginning
Month
Sales
sold
inventory
Purchases
February
$ 8,096.74
$ 7,089.88
$ 36,462.94
March
21,399.55
18,729.18
$ 29,373.06
148,026.15
April
52,693.70
46,100.10
158,670.03
63,981.14
May
12,078.23
11,613.05
176,551.07
154,258.88
June
[7,707.61) [1]
[7,222.87)
$319,196.90
$ 2,541.48
July
29,025.80
34,767.76
328,961.25
4,040.20
August
(5,224.65) [1]
(1,338.44)
283,737.61
419.26
*286 Transferred to
Closing in-
Gross
fixed asset
Month
ventory
profit
account
February
$ 29,373.06
$1,006.86
March
158,670.03
2,670.37
April
176,551.07
6,593.60
May
319,196.90
465.18
June
$328,961.25
$ (484.78)
July
283,737.61
(5,741.96)
$14,496.08
August
284,983.17
(3,886.21) [2]
512.14
The above-mentioned monthly statements and balance sheets of Thermal for the months of February through August 1954 reflect the following at the end of each month as to net loss for the month from operations, cumulative net loss from December 1, 1953, from all operations and the amount of indebtedness owing by Thermal to Remington: Cumulative net loss
Accounts payable
Net loss for month
from 12/1/53 from
by Thermal to
Month
from operations
operations
Remington [1]
February
($13,428.58)
($ 37,719.82)
$ 36,303.77
March
(8,639.28)
(46,359.10)
179,169.00
April
(8,106.00)
(54,465.10)
244,708.02
May
(8,528.90)
(62,994.00)
389,853.19
June
(27,924.12)
(90,918.12)
135,554.30
July
(24,541.76)
(115,459.88)
116,295.27
August
(38,443.54)
(153,903.42)
*287 The operations of Thermal for the remainder of its fiscal year ended November 30, 1954, resulted in further losses. On April 26, 1954, Remington approached both the First National Bank of Fort Worth, Texas, and The Fort Worth National Bank, Fort Worth, Texas, to see if either would be willing to discount trade acceptances executed to it by Thermal. Both banks advised Remington they were not interested in purchasing such trade acceptances. The above-mentioned trade acceptances executed by Thermal to Remington totaling $247,041.36 due June 15, 1954, and those totaling $113,583.02 due July 15, 1954, were discounted by Remington with the First National Bank of the City of New York. Prior to June 15, 1954, that bank forwarded the acceptances due June 15, 1954, to First National Bank of Fort Worth, Texas, for collection. On June 15, 1954, demand was made on Thermal for payment of the acceptances due on that date and payment not having been made the acceptances were protested for nonpayment. *288 Neither Snowden nor any of the partners of Texas Crude then or before or since ever had any loans outstanding with First National Bank of the City of New York. Ted was in New York City on business during the later part of June 1954. While there and following Thermal's nonpayment of its trade acceptances due June 15, 1954, he was contacted by an official of First National Bank of the City of New York. A conference between them respecting such acceptances followed. Being unaware of the existence of such acceptances, or that Thermal owed such an amount, $247,041.36, to Remington, Ted called Snowden about the matter. Later Snowden called Ted and reported that Blankenship had informed him (Snowden) that the merchandise, for which the acceptances had been issued, had been sold and that it would be just a matter of a few days before payment therefor would be received. Thereupon Ted requested of the official of First National Bank of the City of New York with whom he was conferring that Thermal be given an extension of about 30 days for making payment of the acceptances. The request was denied. The following morning Ted negotiated a loan to Thermal from the Bank of Manhattan, which was *289 personally guaranteed by Ted. The proceeds of the loan were used on June 29, 1954, to pay the trade acceptances of Thermal which had become due on June 15, 1954. Prior to July 15, 1954, First National Bank of the City of New York forwarded the trade acceptances executed by Thermal to Remington totaling $113,583.02 due July 15, 1954, to First National Bank of Fort Worth, Texas, for collection. On July 15, 1954, demand was made on Thermal for payment and payment not having been made the acceptances were protested for nonpayment. By an instrument dated July 15, 1954, Ted and Snowden obtained from First National Bank of the City of New York an extension to August 30, 1954, for making payment of the acceptances. By the foregoing instrument Ted and Snowden personally guaranteed prompt payment of the acceptances on the extended date with interest at 6 percent for the extended period and also guaranteed the payment by Thermal to Remington by July 16, 1954, of an amount of $21,988.85 owing by Thermal to Remington on open account. The $21,988.85 consisted primarily of the unpaid 10 percent that should have been made as down payments on merchandise sold by Remington to Thermal. The trade acceptances *290 due July 15, 1954, were paid on August 30, 1954. Following the nonpayment and protest on June 15, 1954, of Thermal's trade acceptances due on that date Ted Weiner and Snowden began an investigation of Blankenship's management of Thermal's affairs. At a meeting of the directors of Thermal on June 21, 1954, J. P. Olive, an experienced credit manager, was employed to serve as credit manager of Thermal. At the same meeting Vincent Thomas, an employee of Texas Crude, was elected vice president of Thermal and thereupon began checking into its affairs. Following Blankenship's resignation in late June or early July 1954, Thomas became manager of Thermal. In its income tax return for its taxable year ended November 30, 1954. Thermal reported a loss of $397,242.15 from its operations during that year. By December 10, 1954, Thomas had assembled all merchandise purchased from Remington by Thermal which the latter had not sold. On that date such merchandise together with all other items of inventory which Thermal had obtained from other sources were sold by Thermal to Leonard Brothers, Fort Worth, Texas, at 50 percent of Thermal's cost or for a total of $164,288.70. Following the foregoing *291 sale Thermal had no merchandise for sale, purchased no further merchandise for sale, and at or before the end of 1954, its officers and stockholders decided that its affairs should be wound up. The advance of $25,000 made by Snowden to Thermal in 1950 and the advance of a like amount made by Ted to Thermal in the same year heretofore mentioned were carried as notes payable on the records of Thermal and were repaid on December 27, 1954. No interest was ever paid by Thermal to Ted and Snowden for the use of those sums. An advance of $9,704.05 made by Snowden to Thermal on February 8, 1954, and carried as notes payable on the records of Thermal was repaid by Thermal on July 2, 1954. During the period November 16, 1953, through September 21, 1954, Snowden and Ted advanced further sums to Thermal substantially in proportion to their stockholdings in it. The dates and amounts of such advances, the dates and amounts of such repayments, and the running balances so advanced and not repaid were as follows: James H. Snowden
Ted Weiner
Date
Repayments
Advances
Balance
Repayments
Advances
Balance
1953
11/16
$ 3,500.00
$ 3,500.00
$ 3,500.00
$ 3,500.00
11/30
3,200.00
6,700.00
3,200.00
6,700.00
12/15
5,000.00
11,700.00
5,000.00
11,700.00
12/18
2,100.00
13,800.00
2,100.00
13,800.00
1954
1/6
4,500.00
18,300.00
1/8
4,500.00
18,300.00
1954
1/13
$ 2,300.00
$ 20,600.00
1/19
$ 2,300.00
$ 20,600.00
3/16
3,000.00
23,600.00
3,000.00
23,600.00
3/25
4,000.00
27,600.00
4,000.00
27,600.00
4/19
23,000.00
50,600.00
23,000.00
50,600.00
4/30
1,900.00
52,500.00
1,900.00
52,500.00
5/20
7,500.00
60,000.00
7,500.00
60,000.00
5/25
2,500.00
62,500.00
2,500.00
62,500.00
6/19
10,000.00
72,500.00
10,000.00
72,500.00
6/22
25,000.00
97,500.00
7/15
5,994.43
103,494.43
5,994.42
78,494.42
7/20
12,500.00
115,994.43
12,500.00
90,994.42
8/13
$12,500
103,494.43
8/16
57,075.47
160,569.90
57,075.47
148,069.89
9/21
125,000.00
285,569.90
125,000.00
273,069.89
12/27
12,500
273,069.90
1955
4/15
6,000
267,069.90
$ 6,000
267,069.89
1956
3/5
1,350
265,719.90
1,350
265,719.89
*292 No notes were issued by Thermal for the foregoing advances. No date was fixed for their repayment. Nor was any interest ever paid or accrued thereon by Thermal. In accordance with the decision in 1954 of its officers and stockholders that its affairs should be wound up, Thermal in 1955 began selling physical assets, making collections on indebtedness owing to it, paying the indebtedness owing by it, and taking other action directed toward winding up its affairs. In winding up its affairs Thermal, as shown above, on April 15, 1955, paid to Ted and Snowden each an amount of $6,000 with respect to the advances they made to it during the period November 16, 1953, through September 21, 1954, and on March 5, 1956, paid to each of them $1,350 with respect to such advances. On some undisclosed date between December 31, 1954, and December 31, 1956, Thermal made an additional payment of $200 to each of them on account of the advances. By the end of 1956 the winding up of the affairs of Thermal had proceeded to the point where there existed no substantial basis for an expectation that it could make any further payment and thereafter no payment was made. The stock of Thermal became worthless *293 in 1956. In the partnership return of income filed by it for 1954, Texas Crude deducted $246,803.59 as a business bad debt with respect to the advances it made to Thermal during the period November 16, 1953, through September 21, 1954. In a schedule attached to the return and explaining the computation of the deduction, it was stated that Thermal disposed of its stock in trade and physical assets during December 1954 and January 1955, was winding up its affairs and that no further business was contemplated. Net assets available to creditors, Texas Crude and Snowden at March 31, 1955, were shown as $52,532.60. On the basis of the foregoing and on the further basis that a total indebtedness of $546,139.79 was owing to Texas Crude and Snowden, the following computation was made: Total
Snowden
Texas Crude
Unsecured amount due creditors
$546,139.79
$273,069.90
$273,069.89
Net assets available
52,532.60
26,266.30
26,266.30
Bad debts
$493,607.19
$246,803.60
$246,803.59
In determining the deficiencies in the cases of the members of the partnership of Texas Crude involved herein the respondent determined that the deductions of $246,803.59 taken by the *294 partnership for 1954 as a bad debt due from Thermal were not allowable and accordingly increased the amount of the partners' distributive shares of partnership net income for that year. In their joint income tax return for 1954, James H. Snowden and Frances G. Snowden deducted $243,345.25 as a busines bad debt with respect to the advances James made to Thermal during the period November 16, 1953, through September 21, 1954, and in computing net long-term capital gain taxable to the extent of 50 percent deducted $5,000 as a capital loss on account of the $5,000 James originally invested in the capital stock of Thermal. In determining the deficiency against James and Frances, the respondent determined that the amount deducted as a bad debt due from Thermal did not constitute an allowable deduction. Respondent further determined that the $5,000 deducted as a capital loss did not constitute a deductible loss for 1954 and increased taxable income by $2,500. During the periods 1942 through 1954, and 1946 through 1954, Texas Crude and Snowden, respectively, were not engaged in the business of organizing, financing, and operating corporations or other businesses. The amounts advanced *295 by Texas Crude through Ted and by Snowden through the period November 16, 1953, to September 21, 1954, which remained unpaid on December 31, 1954, $273,069.90, in the case of Snowden, and $273,069.89 in the case of Texas Crude, were placed by them at the risk of the business of Thermal and constituted contributions to the capital of Thermal and not indebtedness, business or nonbusiness. Opinion Taking the position that Texas Crude and James H. Snowden at all times material herein were engaged in the business of organizing, financing, and operating business ventures, many of which were conducted in corporate form, the petitioners contend that the amount of $246,803.59 deducted in the return of Texas Crude for 1954, and the amount of $243,345.25 deducted in the return of Snowden for the same year with respect to advances made by them, respectively, to Thermal during the period November 16, 1953, through September 21, 1954, represented indebtedness which became worthless and uncollectible in 1954 and were properly deducted for that year as business bad debts. Petitioners further contend that Snowden's stock in Thermal also became worthless in 1954 and that he was entitled to a deduction *296 in that year for a long-term capital loss of $2,500 or 50 percent of the amount of $5,000 which he paid for the stock. Taking the position that the record fails to establish that Texas Crude and Snowden were engaged in the business of organizing, financing, and operating corporations, the respondent contends that the above-mentioned deductions taken in the returns of Texas Crude and Snowden did not represent indebtedness owing by Thermal but constituted contributions to the capital of Thermal which otherwise was insolvent and that accordingly no deduction for bad debts was allowable to Texas Crude and Snowden. The respondent further contends that the stock of Thermal did not become worthless prior to 1957 and that accordingly no deduction for a capital loss with respect to any contributions to the capital of Thermal was allowable for 1954. The petitioners urge that the record sustains their position that Texas Crude and Snowden at the times here material were engaged in the business of organizing, financing, and operating ventures,' many of which were conducted in corporate form. Texas Crude was organized as a partnership in 1942 with Ted Weiner, who is not a petitioner herein, Stanley *297 Weiner, Charles Weiner, and Marjorie W. Bodzy, all three of whom are petitioners herein, as partners. Upon formation of the partnership Ted became its managing partner and has continued in that capacity. As shown by our findings, Ted, during the 12-year period 1942 through 1954, acting in behalf of Texas Crude, participated in organizing, financing, and operating three corporations, Mid-Tex Manuafcturing Company, Thermal, and McFarland Drilling Company. While the evidence shows that Texas Crude participated in the organization and financing of Mid-Tex Development Company, the record does not disclose whether this occurred prior to 1954 or a number of years later. Likewise the record is silent as to when notes of James H. McGraw were "signed" to enable him to obtain bank loans for participating in some ventures not shown to have been conducted as corporations. Similarly the business of Fairway Steak House, in which Texas Crude acquired an interest and which was terminated in 1951, is not shown to have been conducted as a corporation but appears to have been conducted by a friend of Ted in his (the friend's) individual capacity. The earliest date of Snowden's business activities *298 shown by the record is 1946. During the period 1946 through 1954 Snowden participated in organizing, financing, and operating two corporations, Texcrete Company and Thermal. The record does not show that Snowden participated in organizing either Comanche Drilling Company, Southwest Pattern and Foundry Company or Colon Fishing and Development Company. Nor is there any showing that he acquired any stock in or made any loans to Comanche. Although he and his "associates" endorsed an undisclosed amount of obligations of that company, there is no showing that such endorsement was other than an accommodation endorsement. At the solicitation of a personal friend, Snowden invested $3,000 in an undisclosed amount of stock in and loaned $20,000 to Southwest Pattern and Foundry Company. The record does not disclose any material participation by Snowden in the operations of the corporation. The record does not disclose when Colon Fishing and Development Company was organized, whether before or a number of years after 1954. The petitioners contend that the activities of Texas Crude and Snowden in organizing, financing, and operating ventures were such as to bring them within the ambit of , *299 , and other cases of similar import wherein it was held that the taxpayers were engaged in promoting or organizing, financing, and operating corporate or other business enterprises. The question of whether the activities of a taxpayer are sufficient to constitute the carrying on of a business is largely one of fact, the determination of which is to be made from a consideration of the facts in each case. The evidence relating to the activities of Texas Crude and Snowden indicates that their activities related predominantly to the acquisition of the ownership of oil leases from which they received royalities, or the acquisition, either alone or with another or others, of the ownership of oil properties and the receipt of income from the sale or the development thereof. The evidence, however, fails to disclose what corporations, if any, were organized, financed, and operated as a result of or in connection with such activities. As a consequence, we are left to their activities considered above for a determination of the contention of the petitioners. From our consideration of those activities we *300 are of the opinion that they are insufficient to bring them within the rule of the cases relied on by petitioners. In the Campell case it was shown that from 1929 through 1944, a period of 15 years, the taxpayers therein organized, financed, and operated 12 corporations. In the Alexander case it was shown that the taxpayers therein from 1940 to 1958, a period of 18 years, organized, financed, and operated 27 corporations. The record herein fails to show an activity on the part of Texas Crude and Snowden during the pertinent periods involved here corresponding to that shown in the foregoing cases. As a consequence we conclude that during the respective periods pertinent herein Texas Crude and Snowden were not engaged in the business of organizing, financing, and operating corporations or other businesses. Having reached the foregoing conclusion it becomes necessary to determine whether the advances made by Texas Crude and Snowden to Thermal with respect to which Texas Crude and Snowden took the deductions of $246,803.59 and $243,345.25, respectively, represented indebtedness owing by Thermal to them or represented risk capital contributed by them to Thermal. The question of whether *301 a taxpayer's advances made to a corporation in which he is a stockholder represented a capital contribution or a loan is a question of fact. There is no one characteristic which can be said to be decisive in a determination of the question. However, relevant matters and circumstances properly to be considered are the true intent of the taxpayer, bookkeeping, form, the taxpayer's expressions of intent or character, the expectation of repayment, the relationship of advances to stockholdings and the adequacy of corporate capital previously invested. The taxpayer's formal designations of the advances is not conclusive but must yield to facts which indirectly may give rise to inferences contradicting them. A corporation's financial structure in which a wholly inadequate part of the investment is attributed to stock while the bulk is represented by some form of indebtedness to stockholders is lacking in the substance necessary for recognition for tax purposes, and must be interpreted in accordance with realities. , affd. (C.A. 9, 1950), certiorari denied . The testimony of Ted with *302 respect to his conduct of the affairs of Texas Crude and the testimony of Snowden with respect to the conduct of his own affairs show that it was their policy in participating in a business enterprise to limit to a small amount the sum invested in capital stock or other equity in the enterprise and to finance and develop the enterprise with borrowed funds. With a capital stock of only $10,000 Thermal was not adequately capitalized to conduct the business in which it engaged and Ted and Snowden were aware of that fact and, in fact, intended that it be so capitalized. Following the beginning of business by the corporation in December 1949 Ted and Snowden in 1950 each advanced $25,000 to the corporation and subsequently during the time the corporation actively engaged in business they made additional cash advances to it. Firms supplying merchandise to Thermal were understandably unwilling to supply it with merchandise on its credit alone and in order to induce such firms to sell merchandise to it, Ted and Snowden guaranteed payment for all merchandise sold to it. It also was necessary for Ted and Snowden to guarantee repayment of the bank loans obtained by Thermal. Beginning with its *303 first year of operations and continuing until December 10, 1954, when it sold its inventory and ceased the conduct of active business, Thermal each year sustained a loss from operations. At the end of its first year, November 30, 1950, Thermal's loss from operations exceeded its capital by more than $2,300 and by the end of the third year, November 30, 1953, the excess had increased to more than $84,000 as the result of further losses sustained from operations. The facts as to the foregoing losses of Thermal and the further fact that it was in a highly insolvent condition in November 1953 were well known to Ted and Snowden. Despite such a situation Ted and Snowden beginning on November 16, 1953, and continuing through September 21, 1954, made cash advances to Thermal, in the main, substantially in proportion to the stockholdings of each in Thermal. While on September 21, 1954, the unpaid balance of the advances in the case of Snowden was $285,569.90 and with respect to Ted's advances, $273,069.89, the balances were equalized by a payment by Thermal to Snowden on December 27, 1954, of $12,500, thus leaving at the close of December 31, 1954, an unpaid balance in the case of Snowden *304 of $273,069.90 and with respect to Ted's advances an unpaid balance of $273,069.89. No notes or other evidence of indebtedness were ever issued by Thermal for any of the advances, nor was there any fixed date for the repayment of any of the advances. No interest was ever paid or accrued with respect to the advances. The advances were treated by Snowden and Ted as having a status inferior to that of the regular creditors of Thermal in that the latter were paid in full and only its stockholders suffered any loss on its business failure. In the situation presented we are of the opinion that the portion of the advances made by Snowden and Ted to Thermal during the period November 16, 1953, through September 21, 1954, which remained unpaid at the close of December 31, 1954, namely, $273,069.90 as to Snowden and $273,069.89 as to Ted, were clearly contributions to the capital of Thermal and not indebtedness owing by Thermal, that no debtor-creditor relationship existed between Thermal and either of them, and that no portion of those amounts was therefore deductible as bad debts in the returns of Snowden and Texas Crude. In opposition to our reaching the foregoing conclusion the petitioners, *305 relying on the opinion of an accountant, have advanced an argument to the effect that if Thermal's business had been conducted efficiently and honestly during its fiscal year 1954 not more than $50,000 would have been required to finance it adequately; that because of the methods employed by Blankenship in the conduct of the business, some of which the petitioners term fraudulent, Snowden and Ted, instead of "contributing risk capital" to Thermal, "were swindled out of the principal portion" of a sum in excess of $400,000 which they were required to advance to Thermal on account of trade acceptances issued by it for air conditioning units it had purchased, that as a consequence such principal portion constituted a loss from theft and was deductible as such. The evidence shows that at the beginning of Thermal's fiscal year 1954 its operating history was that of an annual loss throughout its 4-year prior existence, the total of which was in excess of $94,000. That amount was more than 50 percent in excess of its capital of $10,000 and the $50,000 which Snowden and Ted had advanced to it as loans in 1950. The purpose for continuing Thermal in business during its fiscal year 1954 was *306 to obtain from the sale of air conditioning units in that year a profit at least equal to the total amount of its losses from the sale of air conditioning units and other merchandise in prior years. The responsibility for accomplishing such an objective rested primarily on Blankenship who was the manager of Thermal. It is true that certain orders for air conditioning units totaling approximately $11,100, after having been countersigned by Lockwood, were raised by Blankenship by approximately $107,250 without authorization by Lockwood, Snowden or Ted. However, the petitioners point us to nothing in the record, nor do we find anything from which we can conclude that the foregoing action of Blankenship was taken with a fraudulent intent rather than with the intent of assuring Thermal's receipt of a sufficient supply of air conditioning units with which to derive the amount of profit for which Thermal was continued in business for the year. There is some testimony that Blankenship caused some air conditioning units which Thermal had consigned to dealers to be recorded on the books of Thermal as having been sold to its dealers. Accepting such testimony as true, we are unable to find that *307 Blankenship's action in that respect was due to a fraudulent intent for to so find would be mere conjecture on this record. Snowden and Ted each testified to having no knowledge of the execution by Thermal of trade acceptances for purchases of air conditioning units until after the nonpayment on June 15, 1954, of the acceptances due on that date and that if such fact had been known to them they would have stopped further execution of such acceptances. Snowden testified that it was his understanding that the units were to be furnished to Thermal on "more or less open account" which was to be paid after the units had been sold. However, the fact remains that the letter of January 18, 1954, written by Snowden and Ted to Remington wherein they guaranteed payment to it for its shipments of merchandise to Thermal begins with the following: "In consideration of your shipping merchandise on standard terms." [Italics added.] There is no showing in the record that the standard terms of credit of Remington or of manufacturers of air conditioning units generally were other than 10 percent cash and 90 percent trade acceptances which were the terms on which Remington made shipments to Thermal. *308 The reports of the monthly audits of Thermal, copies of which were furnished to Snowden and Ted, show with respect to products of Remington that for the months of February through April 1954 products having a total cost of approximately $72,000 were sold for approximately $83,000 of which $52,700 had been sold in April and that at the end of April, Thermal had a closing inventory of such products of approximately $176,550 or more than twice the total amount of the sales for the 3-month period and more than 3 times the amount of the sales for April. The audit report for April 1954 shows that at the end of that month Thermal was indebted to Remington in the amount of $244,708.02. Apparently such an inventory and indebtedness situation at the end of April created no concern on the part of Snowden and Ted since it is not shown that they took any action with respect thereto. From a letter dated June 2, 1954, written by the president of Remington to Blankenship in reply to a letter of the latter dated May 26, 1954, it appears that the weather in Thermal's sales territory during the spring of 1954 had been unfavorable for the sale of air conditioning units. Sales of the units for the month *309 of May were only about $12,080, which, when compared with the April sales of approximately $52,700, shows a heavy decline in sales. From the record it appears that Snowden and Ted, out of an abundance of optimism, authorized Blankenship to launch Thermal on a program in its fiscal year 1954, which, compared with prior years, was a crash program to sell a greatly increased volume of air conditioning units. Although the endeavor eventuated in a considerable loss, we are unable to find that Blankenship engaged in any conduct or action with respect to the endeavor which was fraudulent or constituted theft or to conclude that any portion of the advances here in controversy was deductible as losses resulting from theft. Since we have held, supra, that the portion of the advances made by Snowden and Ted to Thermal during the period November 16, 1953, through September 21, 1954, which remained unpaid at the close of December 31, 1954, constituted contributions to the capital of Thermal, the next question for determination is whether the stock of Thermal became worthless in 1954 as petitioners contend, or in 1957 as respondent contends. The question of whether property becomes worthless *310 during a particular year is a question of fact the determination of which calls for a practical, not a legal test. ; . From our consideration of the evidence bearing on the question of the worthlessness of the stock of Thermal and the contentions of the parties, we are unable to find that it became worthless in either of the years contended for by the respective parties. From a consideration of the evidence relating to Thermal's financial condition at the end of 1954, we find no substantial basis for concluding that the stock was worthless at the end of that year. Further, the stipulated evidence shows that on April 15, 1955, or less than 4 months after the close of 1954, Thermal paid Ted and Snowden each an amount of $6,000 or a total of $12,000 with respect to their advances and that on March 5, 1956, or within 11 months after the foregoing payments, Thermal paid each of them $1,350 or a total of $2,700. From our analysis of the evidence we have found that on some undisclosed date between December 31, 1954, and December 31, 1956, Thermal paid each of them an additional amount *311 of $200 or a total of $400 with respect to the advances. Being of the opinion that the evidence shows that by December 31, 1956, there was no substantial basis for an expectation that Thermal could make any further payment to Ted and Snowden and none having been made, we accordingly have found as a fact that the stock became worthless in 1956. Issue 4. Amount Deductible by Stanley W. Weiner and Donnie Weiner for 1954 as a Net Operating Loss Carried Back from 1956 Issue 5. Amount Deductible by Charles Weiner and Anita Kane Weiner for 1954 as a Net Operating Loss Carried Back from 1956 Opinion The parties have stipulated that in the event we decide that the stock of Thermal became worthless in 1956, Stanley W. Weiner is entitled to deduct for 1954 the amount of $25,035.62 as a net operating loss carryback from 1956, and that Charles Weiner is entitled to deduct for 1954 the amount of $45,904.96 as a net operating loss carryback from 1956. Since we have found that the stock of Thermal became worthless in 1956, we hold that the foregoing respective petitioners are entitled to deductions for 1954 as stipulated. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Stanley W. Weiner and Donnie Weiner, Docket No. 80044; James H. Snowden and Frances G. Snowden, Docket No. 80095; and Charles Weiner and Anita Kane Weiner, Docket No. 80116.↩
1. Returns and cancellations of previous sales in excess of current sales. ↩
2. Results from allowance to dealers on prior sales due to a decline in price, reversing of original entries showing profit on sales of merchandise subsequently reacquired, and some current sales at less than cost.↩
1. Shown in balance sheets and supporting schedules as accounts payable for all months except June and July when $113,583.02 of the above amounts for those months were shown as trade acceptances.↩